IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 06–cv–00573–EWN

MARILYN LANE,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner,
Social Security Administration,

      Defendant.

---

### ORDER AND MEMORANDUM OF DECISION

---

      This is a social security benefits appeal.  Plaintiff Marilyn Lane challenges the final

decision of the Commissioner of Social Security (the "Commissioner") denying her application for

social security disability insurance benefits.  Jurisdiction is premised upon 42 U.S.C. § 405(g)

(2006).

### FACTS

*1.*    ***Medical Evidence***

      Plaintiff was born on April 21, 1953 and was forty-nine years old at the onset of her

alleged disability.  (Admin. R. at 60, 73 [filed June 23, 2006] [hereinafter "Admin. R."].)  Plaintiff

completed the ninth grade and some basic nursing training, and worked in the vocationally

relevant past as a cook, waitress, cashier, and laundress.  (*Id.* at 74, 79, 82.)  Plaintiff alleges that

she became unable to work beginning on January 31, 2003 due to depression, anxiety, fear of going outside, panic, and "possible" bipolar disorder. (*Id.* at 73.)

    *a.*      ***Evidence Submitted to the Administrative Law Judge***

March 18, 2003 assessment notes from the Southwest Colorado Memorial Mental Health Center indicate Plaintiff presented with complaints of anxiety and insomnia. (*Id.* at 210.) Plaintiff also complained that she "can't stand to be alone." (*Id.*) Plaintiff agreed to call for a follow-up appointment after seeing a primary care provider. (*Id.* at 213.)

On March 20, 2003, Plaintiff saw a family doctor, Kimberly Janes Rainer Fairley, M.D. (*Id.* at 172.) Plaintiff complained of panic attacks and was given medication for "depression/anxiety/panic." (*Id.*) Dr. Fairley noted that: (1) Plaintiff suffered migraines "almost daily;" and (2) ruptured discs in Plaintiff's back caused chronic back pain. (*Id.*)

On March 27, 2003, Dr. Fairley noted Plaintiff's mood had improved with medication and that she had suffered no panic attacks since her last visit, but Plaintiff was having some trouble falling asleep. (*Id.* at 168.) Dr. Fairley observed that Plaintiff demonstrated good judgment, clear thinking, and good concentration. (*Id.*)

After a check-up on April 10, 2003, Plaintiff returned to Dr. Fairley on April 17, 2003, complaining of back pain due to ruptured discs. (*Id.* at 166.) Dr. Fairley observed Plaintiff walked "flexed forward" and could not move much. (*Id.*) The doctor prescribed pain medications. (*Id.*)

On April 24, 2003, Plaintiff told Dr. Fairley that: (1) her pastor had been loud at church and had scared her; (2) she had a "big let-down" regarding her son; and (3) she had sustained a

serious head injury as a child. (*Id.* at 164.) Dr. Fairley observed that Plaintiff seemed angry because of these stresses but maintained "good thought chain [and] concentration." (*Id.*)

On May 1, 2003, Plaintiff expressed to Dr. Fairley her interest in seeking disability insurance payments for her back pain, "rage," and anxiety. (*Id.* at 162.) Plaintiff reported that Neurontin "help[ed] a lot [with her] rage and anxiety."[1] (*Id.*) Plaintiff attributed a sensation of "ants in her skin" to forgetting to take her Klonopin.[2] (*Id.*) Dr. Fairley noted Plaintiff's affect was initially shaky and anxious, but it improved when Plaintiff discussed receiving a card from her boyfriend. (*Id.*)

On May 15, 2003, Plaintiff returned to Dr. Fairley, reporting "tough times" due to: (1) a fall she took, during which she struck her head; (2) her granddaughter's attempted suicide; and (3) her friend's husband's deterioration due to brain cancer. (*Id.* at 161.) Plaintiff reported that she: (1) was "in seclusion" doing art projects; (2) felt her friend's husband's "intrusive thoughts" and the physical pain of those around her; and (3) heard "conversations from blocks away." (*Id.*) Dr. Fairley observed that Plaintiff was delusional and that she was rocking while she spoke. (*Id.*) Dr. Fairley also noted that Plaintiff was not taking her Neurontin. (*Id.*) It appears that Plaintiff was unable to purchase the drug because she could not afford it. (*Id.*) Notes from May 16 and

---

[1]Neurontin is a drug used in the treatment of partial seizures in patients with epilepsy. J.E. SCHMIDT, M.D., 4–N ATTORNEYS' DICTIONARY OF MEDICINE 1964 (Matthew Bender 2005) (hereinafter "ADM").

[2]Klonopin is the brand name for a medication used to treat epileptic seizures. 3–K ADM 796.

May 27, 2003 indicate that Dr. Fairley worked with another health care provider to arrange for decreased treatment fees and free medicine for Plaintiff.  (*Id.* at 160.)

On May 29, 2003, Plaintiff returned to Dr. Fairley, stating that "the medicine makes a big difference."  (*Id.* at 159.)  Dr. Fairley observed that Plaintiff was no longer rocking and that her judgment and thinking were "notably improved over [the] last visit, but still delusional . . . . [She] sees a shadow in her room every day that no one else can see[;] cigarettes are going missing."  (*Id.*)  Dr. Fairley also noted that it "appears safer [for Plaintiff] to be at home at this time."  (*Id.*)

On June 12, 2003, Plaintiff and Dr. Fairley discussed medications.  (*Id.* at 158.)  Plaintiff asserted that "Zoloft help[ed] better than Lexapro did" and Neurontin "help[ed] a ton."[3]  (*Id.*)  Dr. Fairley noted Plaintiff's mental status was "much improved" and prescribed an increase in Plaintiff's dosage of Neurontin.  (*Id.*)

A June 24, 2003 ultrasound revealed Plaintiff had a large gallstone.  (*Id.* at 156.)  On June 30, 2003, Plaintiff saw Dianne L. Fury, M.D. for a consultative examination regarding the impact of surgery on her "multiple psychological problems and medications."  (*Id.* at 244.)  Dr. Fury noted Plaintiff took medications for "depression, anxiety, and [a] mild form of schizophrenia."  (*Id.*)  Dr. Fury suggested that Plaintiff be allowed to keep the television in her hospital room on all the time in order to drown out the voices in her head.  (*Id.*)

---

[3]Zoloft and Lexapro are medications used to treat depression.  3–L ADM 5063; 6–Z ADM 244.

On July 10, 2003, Plaintiff returned to Dr. Fairley.  (*Id.* at 144.)  Dr. Fairley observed Plaintiff was recovering from gallbladder surgery and noted that her affect and thinking were much improved and that she was "not so focused on [her] delusional system."  (*Id.*)

Plaintiff saw Dr. Fairley three more times in July 2003.  (*Id.* at 140–42.)  Other than recording complaints of minor ailments and observations concerning Plaintiff's post-surgery healing, Dr. Fairley's records indicate that Plaintiff's mental state was "solid."  (*Id.* at 140.)

Dr. Fairley's notes from July 31, 2003 indicate that Plaintiff's friend, "D.S.," called regarding her concern that as D.S.'s husband — presumably, the aforementioned brain cancer victim — approached death, Plaintiff was exhibiting self-destructive behavior and getting closer to "los[ing] control completely."  (*Id.* at 139.)  Dr. Fairley suggested that D.S. call "911."  (*Id.*)

A July 31, 2003 mental illness evaluation by a doctor at Southwest Memorial Hospital ("SMH") observed Plaintiff was "nervous and scratching [her]self."  (*Id.* at 138.)  The doctor concluded that Plaintiff was anxious due to "situational stress," but doubted she was suicidal. (*Id.*)  While at SMH on July 31, 2003, Plaintiff also consulted with social worker Ann L. Wetton. (*Id.* at 203–08.)  Ms. Wetton concluded that the event precipitating Plaintiff's visit to the emergency room was the arrival of her dying friend's sister, who pushed Plaintiff away from her care-taking duties.  (*Id.* at 203.)  Ms. Wetton noted Plaintiff had seen a therapist for three to four sessions in March 2003.  (*Id.* at 204.)  Ms. Wetton assessed Plaintiff's current global assessment

of functioning ("GAF") score to be thirty, with a high of forty eight and a low of thirty.[4]  (*Id*. at

207.)

Dr. Fairley's records from August 11, 2003 indicate Plaintiff felt stable and had received

"the Poet of the Year Award."  (*Id*. at 137.)  Dr. Fairley opined that Plaintiff's depression,

anxiety, and chronic pain were "stable on current med[ications]."  (*Id*.)

On August 19, 2003, J.W. Ragsdale, Ph.D. conducted a consultative psychological

examination.  (*Id*. at 126–32.)  Dr. Ragsdale observed Plaintiff: (1) was "extremely anxious" and

"unable to sit without shaking and rocking in her chair;" (2) displayed an "extremely exaggerated

startle response" when her name was called; and (3) avoided eye contact throughout the

examination.  (*Id*. at 126.)  Dr. Ragsdale noted Plaintiff's speech was at times severely disrupted

by stuttering and "she would [sometimes] speak to someone else in the room with there being no

one else there."  (*Id*.)  Plaintiff reported cutting herself with a knife when she felt severe anger.

(*Id*. at 128–29.)  Plaintiff recounted a history of "multiple traumatic brain injuries" beginning in

early childhood.  (*Id*. at 127.)  Plaintiff also reported multiple broken marriages, each "continuing

the perpetuation of severe physical abuse."  (*Id*.)  Plaintiff recounted savage beatings at the hands

of her most recent husband.  (*Id*. at 129.)

---

[4]The Global Assessment of Functioning, or GAF Scale, is a numeric scale that mental health professionals use to rate the occupational, psychological, and social functioning of adults. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Text Revision, 4th ed. 2000).  A GAF level of thirty to forty is defined as some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *Id*.  A GAF score in the forty to fifty range indicates serious symptoms or impairment in social, occupational, or school functioning. *Id*.

Plaintiff's medications included Neurontin, trazodone, Zoloft, clonazepam, and oxycodone.[5]  (*Id.* at 128)  Plaintiff indicated she took oxycodone for back pain associated with two blown-out discs.  (*Id.*)  When questioned about her psychiatric treatment history, Plaintiff stated that "she prefer[red] isolating herself in her room as opposed to running the risk of being hospitalized."  (*Id.*)  When questioned about "her ability to walk very far," Plaintiff stated walking would lead her to: (1) be totally overwhelmed by panic; (2) feel a paranoid sense of others watching her and wanting to hurt her; and (3) suffer physical discomfort from her back injury.  (*Id.* at 130.)

Plaintiff described having "seen dead people her entire life."  (*Id.*)  Plaintiff represented that she locked herself in her room "all the time" because she was afraid to interact with others, but that she talked to dead people whom she recognized by "their voice[s] as well as their scent[s]."  (*Id.* at 127.)  Plaintiff reported not wanting to use medications that would take "her voices away" because she would "have no one to talk to."  (*Id.*)

On examination, Plaintiff was unable to focus and repeatedly became distracted, failing to engage in evaluative mental tests.  (*Id.* at 130.)  Dr. Ragsdale diagnosed: (1) post-traumatic stress disorder associated with sexual and physical abuse; (2) "dissociative phenomena" with a delusional belief structure; (3) extreme anxiety with panic attacks; and (4) aspects of bipolar disorder.  (*Id.* at 131.)  Dr. Ragsdale assessed a GAF score of forty.  (*Id.*)

---

[5]Trazodone hydrochloride is used to treat depression.  6–TH–TY ADM 124.  Clonazepam is used to prevent or allay convulsions.  2–CH ADM 2979.  Oxycodone is a narcotic pain reliever that is often abused due to its mind-altering propensities.  4–P ADM 3309–10; 4–O ADM 3228.

On August 25, 2003, Plaintiff returned to Dr. Fairley.  (*Id.* at 136.)  Plaintiff reported that she was doing well on her medication regimen and Dr. Ragsdale had told her she was a good candidate for disability.  (*Id.*)  Dr. Fairley observed Plaintiff was stable, appeared happy with "signs of mania," had "okay" judgment, and was thinking clearly.  (*Id.*)  Dr. Fairley also noted that Plaintiff had brought a letter in her own handwriting that she claimed was from her "dead mother."  (*Id.*)

On September 8, 2003, Plaintiff visited Dr. Fairley, reporting increased delusions of dead people "coming to her."  (*Id.* at 134.)  Dr. Fairley noted Plaintiff appeared to enjoy and find relief in sharing her "delusions" and past experiences.  (*Id.*)  Dr. Fairley also noted Plaintiff's judgment was "poor" and that she was "thinking clearly."  (*Id.*)  In contemporaneously dated disability insurance paperwork, Dr. Fairley endorsed Dr. Ragsdale's mental impairment findings and emphasized Plaintiff's chronic back pain.  (*Id.* at 135.)  Citing Dr. Ragsdale's evaluation, Dr. Fairley wrote that Plaintiff would be disabled for a year or longer, "no matter what therapy she receive[d]."  (*Id.*)

On September 15, 2003, Catherine J. Corsello, M.D. completed a mental residual functional capacity assessment of Plaintiff.  (*Id.* at 174.)  Dr. Corsello found Plaintiff to be "moderately limited" in her abilities to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain concentration for extended periods; (4) work with or near others without being distracted; (5) complete a normal workweek without interruptions due to psychological symptoms; (6) interact appropriately with the general public; (7) accept instructions from and respond appropriately to instructions from supervisors; and (8) get along

with coworkers or peers without distracting them.  (*Id.* at 174–75.)  Dr. Corsello explained her

findings:

> [Plaintiff] experiences anx[iety]/depr[ession] and is sensitive to stressful
> interpersonal relationships. . . . [Dr. Fairley] note[s] [her] to be stable.  She does
> talk about "channeling" and communicating with the dead — but was never noted
> to be [psycho]tic [except] at [psychological] c[apacity] e[valuation] (where she
> appeared to be exaggerating her [symptoms]).  [Plaintiff's psychological
> symptoms] may occasionally interfere with her ability to complete a normal
> workday/week or maintain pace, but not beyond customary tolerance when work
> does not involve significant complexity/judgment and can be learned in up to
> [three] mo[nths].  She can relate adequately to others if contact is not frequent or
> prolonged.

(*Id.* at 176.)

In the latter half of September 2003, Plaintiff twice saw Dr. Fairley.  (*Id.* at 219–20.)

Plaintiff reported feeling frozen such that she was unable to bake bread or pies.  (*Id.* at 219.)  Dr.

Fairley recommended that Plaintiff try "puttering in [the] kitchen to get [her] fear of cooking

under control."  (*Id.*)

In October 2003, Dr. Fairley's notes indicate Plaintiff reported increased back pain.  (*Id.*

at 217.)  Dr. Fairley observed that Plaintiff consistently exhibited clear thought processes, but

stuttered when any "threatening" subject was discussed.  (*Id.* at 218.)  Dr. Fairley suggested

Plaintiff continue with Percocet and a "walking program" for her back pain.[6]  (*Id.* at 217.)

On October 30, 2003, Plaintiff saw Tom G. Campbell, M.D. at the Southwest Mental

Health Center for a psychiatric evaluation.  (*Id.* at 192.)  Plaintiff reported residing in a homeless

shelter after being evicted from her apartment when her friend, D.S., "betrayed" her.  (*Id.*)  On

---

[6]Percocet is the brand name for a pain killer containing oxycodone.  4–P ADM 3309–10.

exam, Dr. Campbell noted: "stutters but otherwise speech normal, crying but denies suicidal ideation, memory problems, anxiety, rapid thoughts, hears voices from her dead mother and best friend's dead husband, not command hallucinations." (*Id.*)  Dr. Campbell assessed: (1) depression with psychotic features; and (2) post-traumatic stress disorder from previous abuse. (*Id.* at 193.) Dr. Campbell recommended that Plaintiff continue counseling and prescribed "Zyprexa to help with rapid thoughts and 'hallucinations.'"[7] (*Id.*)

On October 24, 2003, Plaintiff returned to the Southwest Colorado Mental Health Center for an evaluation and referrals for help with her housing, finances, and legal situation. (*Id.* at 196–201.)  The record does not reveal the name or status of the healthcare provider with whom she spoke. (*See id.* at 201.)  In a checklist of psychological symptoms, the healthcare provider placed question marks next to boxes for auditory and visual hallucinations, noting Plaintiff's assertion that she heard "voices from loved ones." (*Id.* at 199.)  The healthcare provider diagnosed major depression with a current GAF score of fifty-five, high being fifty-nine and low being fifty-five. (*Id.* at 200.)

On November 11, 2003, Plaintiff again saw Ms. Wetton. (*Id.* at 251.)  Plaintiff reported feeling stress because the shelter where she was living required that she go back to work. (*Id.*)

Notes from a December 16, 2003 visit to Dr. Fairley indicate Plaintiff was the "most lucid she [had] ever been." (*Id.* at 216.)  Plaintiff reported she was staying at various shelters and was awaiting placement in an apartment. (*Id.*)  Dr. Fairley diagnosed back pain and noted: "bipolar

---

[7]Zyprexa is an antipsychotic agent.  6–Z ADM 477.

(?), [sic] ? [sic] schizophrenia." (*Id.*)  On February 3, 2004, Dr. Fairley noted Plaintiff was

distraught and had been off of Klonopin since December, when her roommate took her pills.  (*Id.*

at 214.)

### b.       Evidence Submitted to the Appeals Council

On February 17, 2004, Plaintiff reported to Dr. Fairley that, while on her medications, she

had been walking approximately five miles three to four times per week, which sometimes hurt

her back.  (*Id.* at 294.)  Plaintiff stated that she had no fear about being out of the house and that

she was happy now that she had her own place.  (*Id.*)  Dr. Fairley observed Plaintiff was not

trembling or rocking and appeared to be thinking clearly.  (*Id.*)

On March 2, 2004, Plaintiff returned to Dr. Fairley, who observed that Plaintiff was

anxious with shaking legs and increased stuttering.  (*Id.* at 293.)  Dr. Fairley twice noted that

Plaintiff reported she had not missed taking any medications.  (*Id.*)  On March 16, 2004, Plaintiff

returned to Dr. Fairley, having run out of money for pills.  (*Id.* at 292.)  Plaintiff reported having

"a lot of panic attacks." (*Id.*)  Plaintiff also reported she was "doing Bible studies" three times a

week and would be baptized into the Mormon church in April.  (*Id.*)  On March 30, 2004,

Plaintiff reported to Dr. Fairley that she was working on a book of poetry and that her Zyprexa

was very effective.  (*Id.* at 291.)  Dr. Fairley observed Plaintiff was calm, happy, and exhibiting

"okay" judgment and clear thinking.  (*Id.*)

On April 13, 2004, Plaintiff reported to Dr. Fairley that she had been baptized and had

published two books of poetry, with a third on the way.  (*Id.* at 290.)  Dr. Fairley noted that

Plaintiff's Zyprexa was not in, but Plaintiff's affect was the "best ever" and Plaintiff's judgment

was good and her thinking clear.  (*Id.*)  On April 27, 2004, Plaintiff reported that she was getting

a fourth book of poetry printed.  (*Id.* at 289.)  Dr. Fairley observed that Plaintiff's affect, thinking,

and judgment were strong.  (*Id.*)  Because Plaintiff's Zoloft had not come in, Dr. Fairley

substituted Lexapro.  (*Id.*)

On May 10, 2004, Plaintiff reported waking up "feeling like she had sex all night" and

experiencing other unusual symptoms.  (*Id.* at 288.)  Dr. Fairley noted Plaintiff's Zoloft had

arrived.  (*Id.*)  On May 24, 2004, Plaintiff reported suffering a sinus infection.  (*Id.* at 287.)  Dr.

Fairley noted that Plaintiff's affect was appropriate for the stress of illness.  (*Id.*)

On June 3, 2004, Dr. Fairley wrote a note excusing Plaintiff from jury duty due to "mental

illness [and] back pain."  (*Id.* at 284.)  On June 7, 2004, Plaintiff reported she was doing well on

her medications now that she had them all for the first time in a while.  (*Id.* at 283.)  Other than

observing that Plaintiff had experienced increased anxiety due to Independence Day fireworks,

Dr. Fairley's treatment notes reveal that Plaintiff's mental state remained stable through June and

July of 2004.  (*Id.* at 282–80.)

On July 29, 2004, Dr. Fairley filled out a disability insurance form, diagnosing Plaintiff

with "schizophrenia — dissociative phenomena, hallucinations[;] post-traumatic stress disorder;

panic disorder; bipolar disorder; [and] chronic back pain."  (*Id.* at 279.)  Dr. Fairley assessed that

Plaintiff had a "poor prognosis for recovery" and was "not able to work in any capacity."  (*Id.*)

On August 4, 2004, Plaintiff saw Dr. Fairley for an exam due to "post-coital spotting."

(*Id.* at 277.)  Plaintiff's mental state remained stable through August 2004, and Plaintiff noted that

her granddaughter had moved in with her. (*Id.* at 275.) Gynecology notes indicate that Plaintiff

was menopausal. (*Id.* at 274.)

On September 1, 2004, Plaintiff reported suffering anxiety and depression even though she

had been taking all of her medications. (*Id.* at 273.) Dr. Fairley observed that Plaintiff "look[ed]

anxious and depressed" and was exhibiting baseline judgment and thinking. (*Id.*)

On October 4, 2004, Plaintiff reported she was having a hard time with her granddaughter.

(*Id.* at 272.) Dr. Fairley observed Plaintiff's affect to be good, with baseline judgment and

thinking. (*Id.*) Dr. Fairley assessed Plaintiff to be stable with "bipolar/ ? [sic] schizophrenia."

(*Id.*) On October 18, 2004, Plaintiff reported having had no medications for two weeks. (*Id.* at

270.) Dr. Fairley noted that Plaintiff had her medications now and, as of the visit, observed

normal judgment and thinking. (*Id.*)

On November 1, 2004, Plaintiff reported to Dr. Fairley that she was "home schooling" her

granddaughter. (*Id.* at 269.) Plaintiff reported insomnia. (*Id.*) Dr. Fairley observed Plaintiff's

affect to be "happy — but rapid shifts." (*Id.*) Dr. Fairley assessed: "? [sic] in a manic phase of

severe bipolar." (*Id.*)

On December 2, 2004, Plaintiff reported that her mental state had improved and requested

a muscle relaxant for back spasms. (*Id.* at 268.) Dr. Fairley noted Plaintiff's affect, judgment,

and thinking to be "good." (*Id.*) On January 13, 2005, Plaintiff reported that she had not been

able to purchase any of her medications except for Neurontin and Zoloft. (*Id.* at 267.) Dr.

Fairley observed that Plaintiff looked down, but not unstable. (*Id.*) Plaintiff also submitted

-13-

evidence that postdates the ALJ's decision, which the Appeals Council returned to her for use in filing a new claim. (*See id.* at 6.)

**2.**     ***Procedural History***

On May 16, 2003, Plaintiff filed an application for disability insurance benefits. (*Id.* at 60–63.)  On September 16, 2003, the Social Security Administration denied Plaintiff's application. (*Id.* at 44–48.)  On October 9, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 40–43.)  On September 8, 2004, the ALJ held a hearing, at which Plaintiff testified, represented by her attorney. (*Id.* at 31.)  A vocational expert ("VE"), Dr. Fairley, and Plaintiff's granddaughter, Cheyenne Moore, also testified at the hearing. (*Id.* at 297.)

Plaintiff testified that she stopped working in January 2003 when the business that employed her closed. (*Id.* at 302.)  Plaintiff represented that shortly thereafter, she was hired at a gas station and terminated after one day without reason. (*Id.*)  However, Plaintiff admitted that her friend, D.S., who had a restraining order against her at the time, also worked at the gas station, but asserted that she did not know if the restraining order played a role in her termination. (*Id.* at 302–03.)  Plaintiff testified that she did not know why D.S. had a restraining order against her or why police had removed her from D.S.'s house. (*Id.* at 305.)

Plaintiff testified regarding her physical impairments. (*Id.* at 302–04.)  Plaintiff represented that her back would cause her problems if she returned to work because the pain made it difficult to stand, lift, and walk. (*Id.* at 303–04.)  Plaintiff stated that "[t]he fourth and

fifth lumbar disc [sic] are gone" and that she took Percocet for resulting pain in her lower back and legs. (*Id.* at 303.)

Plaintiff testified regarding her mental impairments. (*Id.* at 304–09.) She stated: "I've got the nerves and anxiety." (*Id.* at 304.) Plaintiff explained that she was having a difficult time coping with testifying and that she was presently having a panic attack. (*Id.*) Plaintiff stated that she occupied herself by keeping her apartment clean and that she only left the apartment "a couple times a month" because she was afraid of people and, if she got "close to someone that [was] hurting, [she] c[ould] feel it." (*Id.* at 306.) Plaintiff testified that she shook when she was nervous and that she no longer cut herself when she was upset because she believed she would be "locked up in a mental hospital" if she continued to do so. (*Id.* at 317.)

Plaintiff testified that she talked to dead people "all the time." (*Id.* at 308.) Plaintiff indicated that she conversed with a variety of deceased individuals, including her mother, grandmother, and D.S.'s husband. (*Id.*) Plaintiff testified that she was unable to afford a psychiatrist or mental health counselor. (*Id.* at 314.)

Plaintiff indicated that the only guests she allowed into her apartment were missionaries from her church. (*Id.* at 306.) Plaintiff stated that the missionaries came to her house approximately three times a week to conduct a Bible study with her granddaughter. (*Id.* at 316.) Plaintiff testified that while the Bible study went on in the dining room, she sat on the couch and read or slept. (*Id.*) She represented that she attended weekly church services and a small gospel study, where she only sat and listened because she did not "like talking to people." (*Id.* at 307.)

Plaintiff stated that when she was not cleaning her apartment, she read the Bible or watched movies.  (*Id.* at 306.)  Plaintiff testified that she did laundry in the bathtub to avoid encountering people at the laundromat.  (*Id.* at 310.)  Plaintiff represented that someone from church took her grocery shopping once a month and that Ms. Moore took the trash out so that Plaintiff did not have to go outside.  (*Id.* at 310.)  Before Ms. Moore lived with her, Plaintiff's neighbor would check on her three or four times a day.  (*Id.* at 318.)

Plaintiff stated that she walked to adult education classes two to four times a week to study spelling and grammar.  (*Id.* at 310–11.)  Plaintiff testified that she did not attend classes with teachers or other students, but instead worked in a computer room by herself for four hours at a time.  (*Id.* at 311.)

With respect to her employability, Plaintiff testified that she could not work even if placed by herself because there would still be "a boss or somebody around that [she] would have to answer to."  (*Id.* at 312.)  Plaintiff also stated that before her granddaughter moved in with her, she would sleep for three or four days at a time when she felt depressed, but that Ms. Moore now would wake her up after "just a few hours."  (*Id.* at 313.)

Ms. Moore testified that she cooked for Plaintiff and did most of the household cleaning.  (*Id.* at 320.)  Ms. Moore indicated that she helped Plaintiff with her medications and occasionally heard her talking to people that were not present.  (*Id.*)  Ms. Moore stated that she found Plaintiff upset and rocking back and forth about six times a week.  (*Id.* at 321.)

In light of Dr. Fairley's "fairly current and fairly exhaustive" reports, the ALJ limited the doctor's testimony to "anything that [was not] contained in the reports."  (*Id.* at 300.)  Dr. Fairley

testified that she was a family practitioner, but that she did a lot of psychiatry and had more than one-hundred hours of continuing medical education in psychopharmacology. (*Id.* at 322.) Dr. Fairley asserted that Plaintiff was post-menopausal and that menopause could exacerbate the symptoms of post-traumatic stress disorder. (*Id.*) Dr. Fairley testified that Plaintiff had been diagnosed with schizophrenia, but that "those [diagnosing] doctors [were] also family practitioners." (*Id.*) Dr. Fairley indicated that she agreed with Dr. Ragsdale's assessment that Plaintiff suffered from "severe anxiety associated with post[-]traumatic stress disorder with the delusional problems and panic attacks and associated phenomenon [sic]." (*Id.* at 322–23.)

Dr. Fairley also testified regarding a mental capacity evaluation form similar to one completed by Dr. Corsello. (*Id.* at 324–27.) Dr. Fairley stated her disagreement with Dr. Corsello's finding that Plaintiff did not exhibit the following symptoms of affective disorders: (1) decreased energy; (2) feelings of guilt or worthlessness; (3) thoughts of suicide; (4) hallucinations, delusions, or paranoid thoughts; (5) flight of ideas; (6) decreased need for sleep; and (7) easy distractibility. (*Id.* at 324–25.) Dr. Fairley also disagreed with Dr. Corsello's failure to acknowledge the following symptoms of anxiety-related disorders: (1) generalized, persistent anxiety accompanied by motor retention, hyperactivity, apprehensive expectation, and vigilance in scanning; (2) persistent irrational fear of a situation resulting in a compelling desire to avoid the dreaded situation; (3) recurrent, severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and a sense of impending doom occurring at least once a week; and (4) recurrent and intrusive recollections of a traumatic experience that are the source of traumatic stress. (*Id.* at 325.) Dr. Fairley also noted that Plaintiff's history of multiple head

injuries "affect[ed] her ability to function personality-wise." (*Id.*) Thus, Dr. Fairley gave the following functional limitations: (1) extreme difficulties in maintaining social functioning; (2) frequent deficiencies in maintaining concentration, persistence, and pace; and (3) repeated episodes of decompensation. (*Id.* at 327.) Dr. Fairley concluded that: (1) Plaintiff would not be able to handle working under a supervisor; (2) her agoraphobia would make it difficult to get to any job; and (3) Plaintiff could not work from home "because a schedule would be perceived as a threat." (*Id.*)

The VE testified at the hearing regarding the vocational exhibits in Plaintiff's file. (*Id.* at 330–31.) The VE testified that an individual of Plaintiff's age and educational background without any physical limitations who was not allowed to deal with the general public, allowed only occasional contact with coworkers, no complex tasks, and minimal supervision would not be able to perform any of Plaintiff's past work — or any work at all . (*Id.* at 331.)

On November 5, 2004, the ALJ issued a decision, finding that Plaintiff had severe impairments but that such impairments would not preclude her from performing her past relevant work as a laundry worker. (*Id.* at 32.) In reaching his conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since January 31, 2003. (*Id.*) The ALJ next determined that Plaintiff's affective disorder and anxiety disorder constituted severe impairments. (*Id.*) However, the ALJ found that: (1) Plaintiff's "alleged 'mild' schizophrenia [was] not a medically determinable impairment;" and (2) Plaintiff's "alleged back pain [was] not caused by a medically determinable impairment," noting the absence of surgical records confirming Plaintiff's report of "having two vertebra removed." (*Id.*) In making his

determination, the ALJ relied heavily on Dr. Corsello's consultative evaluation and "the treating

physician's treatment notes [that] indicate [Plaintiff] was stable on medication for several

months." (*Id.* at 32–33.)  The ALJ determined that Plaintiff had the following limitations as found

in listings 12.04 and 12.06: (1) mild restrictions of activities of daily living; (2) moderate difficulty

maintaining social functioning; and (3) moderate difficulty in maintaining concentration,

persistence, or pace. (*Id.* at 33.)  Then, the ALJ determined that Plaintiff's impairments did not

meet or equal the listed impairments in Appendix One, Subpart P, Regulations Number Four.

(*Id.*)

        In making this determination, the ALJ considered the evidence. (*Id.* at 33–37.)  The ALJ

noted that he did not find Plaintiff to be a credible witness because, while Plaintiff's condition had

generally stabilized from March to July 2003, her "condition appear[ed] to have seriously

worsened for no reason other than it coincided with [Dr. Ragsdale's] consultative examination."

(*Id.* at 34.)  The ALJ wrote: "Dr. Ragsdale is the only physician who has witnessed the claimant

apparently speaking to someone who is not there.  All other physicians rely on the claimant's self-

reports." (*Id.* at 34–35.)  Accordingly, the ALJ did "not find the claimant's talking to dead people

credible." (*Id.*)  Further, the ALJ noted that a week after Plaintiff visited Dr. Ragsdale, her

condition "appear[ed] remarkable [sic] improved" in a visit to Dr. Fairley. (*Id.* at 35.)  The ALJ

expressed great skepticism with regard to Plaintiff's assertion that she was afraid of people,

noting that missionaries visit her home two to three times each week. (*Id.* at 36.)  The ALJ

determined that Plaintiff's daily activities were inconsistent with her claim of disability, noting she

performed normal activities of daily living such as "household chores, watching television and

movies, going to church, going to a small [B]ible study class at church, food shopping, attending adult education classes . . ., writing poetry, and using the computer for up to four hours at a time." (*Id.*)  The ALJ did not find Plaintiff's claim that she had slept for three to four days at a time credible, noting that her treatment records failed to reflect such a pattern and that such excessive sleeping was inconsistent with her activities of daily living.  (*Id.*)

The ALJ gave no weight to Dr. Fairley's assessment that Plaintiff is unable to work because: (1) "that determination is left to the sole discretion of the Commissioner;" and (2) "Dr. Fairley d[id] not support her conclusion of disability with any symptoms or degree of limitations caused by the symptoms."  (*Id.*)  The ALJ gave little weight to Dr. Fairley's testimony because: (1) she was a family practitioner rather than a mental health specialist; (2) her "office notes d[id] not support the marked and extreme limits she indicated" at the hearing; and (3) she added the diagnosis of postmenopausal, which neither she nor any other doctor ever diagnosed.  (*Id.*)  The ALJ gave "great weight" to the opinions of Dr. Corsello, which he ALJ deemed "not inconsistent with the other substantial evidence."  (*Id.*)  The ALJ also discounted Ms. Moore's testimony, stating it was the same as Plaintiff's testimony and giving it the same weight.  (*Id.*)

Based upon his consideration of the evidence, the ALJ determined Plaintiff's residual functional capacity ("RFC"), finding:

> [Plaintiff] has the [RFC] to perform heavy, medium, light, and sedentary work-related activities, as she has no impairments that limit her ability to perform exertional work activities.  Due to her mental impairments, [Plaintiff] cannot deal with the general public; [sic] can occasionally deal with co-workers, cannot perform complex tasks . . ., and can deal with minimal supervision.

(*Id.*)  Next, the ALJ determined that Plaintiff could perform her past relevant work as a laundry worker.  (*Id.* at 37–38.)  The ALJ noted that the VE testified Plaintiff would not be able to perform her past relevant work, but found the VE's testimony to be "inconsistent with the [Dictionary of Occupational Titles] information submitted by the [VE]" and, therefore, not credible.  (*Id.* at 38.)  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id.*)

On April 22, 2005, Plaintiff requested a review of the ALJ's decision.  (*Id.* at 23.)  On August 16, 2005, the Appeals Council affirmed the ALJ's decision.  (*Id.* at 14–16.)  However, on October 12, 2005, the Appeals Council set aside that action, allowing counsel for Plaintiff time to submit additional evidence and argument.  (*Id.* at 12.)  On January 26, 2006, the Appeals Council once again affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review.  (*Id.* at 5–8.)  On March 28, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits.  (Compl. [filed Mar. 28, 2006].)  On September 5, 2006, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed Sept. 5, 2006] [hereinafter "Pl.'s Br."].)  That day, Plaintiff also filed a motion to supplement the administrative record.  (Mot. to Supplement the Admin. R. [filed Sept. 5, 2006].)  On September 21, 2006, the court denied the motion to supplement.  (Minute Order [filed Sept. 21, 2006].)  On September 28, 2006, Plaintiff filed a supplemental opening brief.  (Pl.'s Supplemental Opening Br. [filed Sept. 28, 2006] [hereinafter "Pl.'s Suppl."].)  On November 11, 2006, the Commissioner filed a response.  (Def.'s Resp. Br. [filed Nov. 11, 2006] [hereinafter "Def.'s Resp."].)  On November 20, 2006, Plaintiff filed her reply.  (Pl.'s Reply Br. [filed Nov. 20, 2006] [hereinafter "Pl.'s Reply"].)  This matter is fully briefed.

## ANALYSIS

### 1.    Standard of Review

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where
> a claim has been denied by the Commissioner of Social Security or
> a decision is rendered under subsection (b) of this section which is
> adverse to an individual who was a party to the hearing before the
> Commissioner of Social Security, because of failure of the claimant
> or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall
> review only the question of conformity with such regulations and
> the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The

court must uphold the Commissioner's decision if it is supported by substantial evidence.  *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987).  That does not mean, however, that this court's review is merely cursory.  To

find that the ALJ's decision is supported by substantial evidence, the record must include

sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate

conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled

or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e) (2007); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751. *3.*

*Disability Determination*

Plaintiff sets forth four arguments in support of her contention that the ALJ's decision is erroneous. (Pl.'s Br. at 7–18.) Plaintiff asserts that the ALJ erred by: (1) improperly assessing her credibility; (2) finding she did not have the "severe" impairment of lower back pain; (3) disregarding the opinions of her treating physician, Dr. Fairley, and consultative examiner, Dr.

Ragsdale; and (4) disregarding the testimony of the VE concerning Plaintiff's ability to do her past

relevant work. (*Id.*)  I consider each argument in turn.

      *a.      Credibility Assessment*

      Plaintiff asserts that in determining she was not credible in part because her activities of

daily living were inconsistent with her claimed disability, the ALJ "misrepresent[ed] the frequency

of [her] activities." (*Id.* at 14–15.)  More specifically, Plaintiff contends that the ALJ "lumped

together a year's worth of activities, giving the appearance that [Plaintiff] does these regularly in

an 'average' day." (*Id.* at 15.)  Plaintiff also asserts that because the "ALJ ignored the fact that

[Plaintiff] saw Dr. Fairley almost every two weeks" and "failed to consider that [Plaintiff] took

numerous medications," the ALJ erred by "not address[ing] most of the factors of [Social

Security Ruling] 96–7p." (*Id.* at 15–16.)  I disagree with both lines of argument.

      "Credibility determinations are peculiarly the province of the [ALJ].'" *McGoffin v.*

*Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002) (citation and quotation marks omitted).  Indeed,

credibility determinations made by an ALJ are generally considered binding upon review. *Gossett*

*v. Bowen*, 962 F.2d 802, 807 (10th Cir. 1988).  Such determinations "should not be upset if

supported by substantial evidence." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).

However, "findings as to credibility should be closely and affirmatively linked to substantial

evidence and not just a conclusion in the guise of findings." *Huston*, 838 F.2d at 1133.  In

assessing credibility, the ALJ may consider not only the medical evidence, but also: (1) the

individual's daily activities; (2) the location duration, frequency, and intensity of her pain or other

symptoms; (3) factors that precipitate or aggravate the symptoms; (4) the type, dosage,

effectiveness, and side effects of any medication taken to alleviate her symptoms; (5) any other measures or treatment she employs; and (6) any other factors relevant to her limitations.  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at *3 (July 2, 1996) (hereinafter "SSR 96–7p").[8]

In accordance with the first factor of SSR 96–7p, the ALJ found that the record evidence and Plaintiff's own testimony suggested she engaged in a normal range of daily activities, including: "performing household chores, watching television and movies, going to church [and] [B]ible study class . . ., food shopping, attending adult education classes [two to four] time [sic] a week, writing poetry, and using the computer for up to four hours at a time." (Admin. R. at 36.) Substantial evidence supports the ALJ's conclusion.  In response to her attorney's question about what she did during the day, Plaintiff responded: "I keep my apartment clean . . . and when all my housework is done, I read my Bible or I watch a movie." (*Id.* at 306.)  Notwithstanding her representation that she left her apartment "[o]nly a couple times a month" and did not go out more "[b]ecause [she was] afraid of people, and [she did not] want to run into anybody," Plaintiff also represented that she tried to go to church and Bible study every week, lived with her teenage granddaughter, allowed missionaries to visit her home three times a week, walked to adult education classes two to four times each week, and went on a monthly food shopping trip. (*Id.* at 306–07, 309–311, 316; *cf. id* at 130 [reporting to Dr. Ragsdale that going outside causes her to be "totally overwhelmed by panic" and fear of others].)  As the ALJ noted, Plaintiff's testimony that the missionaries came only to visit her granddaughter is belied by her representation to Dr.

_____

[8]Social Security Rulings are binding on the ALJ.  *See* 20 C.F.R. § 402.35 (2007).

Fairley that Plaintiff participates in home Bible studies three times each week. (*Id.* at 36, 292.)

Additionally, I note that Plaintiff: (1) consistently made bi-monthly visits to Dr. Fairley for over

two years; (2) lived in a homeless shelter for a period of time during which she complained of

feeling stress not due to her proximity to other people but rather because the shelter required that

she go back to work; (3) engaged in a sexual relationship; (4) lived with various roommates; (5)

was baptized into the Mormon church; and (6) took three to four five-mile walks each week. (*Id.*

at 251, 277, 161–62, 290, 294.) Thus, I find that substantial evidence supported the ALJ's

determination that Plaintiff's daily activities are inconsistent with her alleged level of disability.

*See Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992) (stating discrepancy between

claimant's statements concerning daily activities is properly considered in credibility

determination); *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (stating that a

claimant's credibility may be questioned due to inconsistency of representations with prior

statements and the medical record).

Plaintiff also contends that the ALJ erred by "ignor[ing] the fact that [Plaintiff] saw Dr.

Fairley almost every two weeks" and "fail[ing] to consider that [Plaintiff] took numerous

medications." (Pl.'s Br. at 15–16.) I fail to see how the absence of an express statement by the

ALJ that he considered the frequency of Plaintiff's visits to Dr. Fairley might undermine the

substantial basis for the ALJ's determination that Plaintiff was not forthright with respect to the

impact her physical and mental impairments had on her daily life. Indeed, the ALJ "is not required

to discuss every piece of evidence," so long as the record demonstrates the ALJ considered all of

the relevant evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) This court's

review of the record and the ALJ's opinion does not undermine the ALJ's representation that he considered "all of the documents identified in the record as exhibits [and] the testimony at the hearing." (Admin. R. at 31.)  Moreover, the ALJ's opinion is replete with references to Plaintiff's frequent visits to Dr. Fairley, observing, *inter alia*, that Dr. Fairley's treatment notes indicate that Plaintiff was generally stable from March through September 2003.  (*See id.* at 33–37.)

Plaintiff's further contention that the ALJ failed to consider that she takes numerous medications is flatly wrong.  (Pl.'s Br. at 15–16.)  The ALJ's decision consistently refers to various doctors' assessments of the efficacy of Plaintiff's medications.  (*See* Admin. R. at 33–37.) Moreover, the ALJ noted that Plaintiff's "mental status appears to have stabilized after she started her medication, except for the short period after her friend's husband died." (*Id.* at 34.)  Other than this one episode, the record suggests that instances of mental instability generally aligned with Plaintiff's failure to take her medications.  (*See, e.g.*, *id.* at 161–62 [poor mental state, not taking all medications], 214 [poor mental state, roommate took Plaintiff's medications], 267 [poor mental state, off medications], 270 [poor mental state, off medications for two weeks], 283 [first time on medications in weeks], 292 [suffering panic attacks, off of medications].)  Thus, Plaintiff has failed to point to any missteps in the ALJ's consideration of the factors set forth in SSR 96–7p.  Accordingly, based on the foregoing, I find that the ALJ did not err in making his credibility determination.

### b.      Plaintiff's Back Pain

Next, Plaintiff attacks the ALJ's step-two determination that her alleged back pain does not constitute a "severe" impairment.  (Pl.'s Br. at 7–9.)  Plaintiff asserts that the ALJ: (1) misinterpreted her testimony; (2) ignored evidence suggesting her back pain was severe; and (3) relied on a lack of diagnostic studies of Plaintiff's back, even though the relevant regulations do not require such studies.  (*Id.*)  Further, although the ALJ issued his decision on February 24, 2005, Plaintiff argues that the Commissioner erred by refusing to consider an April 25, 2005 radiology report indicating that Plaintiff suffers "degenerative narrowing of the L4–5 with bone spur formation."  (Pl.'s Suppl. at 3–6.)

A physical impairment is severe if it significantly limits one's ability to do basic work activities, such as "standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling."  20 C.F.R. § 404.1521(a), (b)(1) (2007).  Further,

> [a]n impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at [step two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered[.]

Soc. Sec. Rul. 85–28, 1985 WL 56856, at *3 (1985).  The severity determination is based solely on medical factors, and does not include consideration of such vocational factors as age, education, and work experience.  *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003).  "Step two is designed 'to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability.'"  *Lee v. Barnhart*, 117 F. App'x 674, 677 (10th Cir. 2004) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 156 [1987]).

While "the mere presence of a condition or ailment" is not enough to get the claimant past step two, *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997), a claimant need only make a *de minimis* showing of impairment to proceed to further steps in the analysis, *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004).

In determining that Plaintiff's back pain was not "severe," the ALJ merely stated: "[Plaintiff's] alleged back pain is not caused by a medically determinable impairment.  The claimant reports having two vertebra removed, but there are no surgical records."  (Admin. R. at 32.)  As set forth below, I find that the ALJ's conclusion was improper.

I first note that to the extent Plaintiff's own testimony regarding her medical history is relevant to the step-two determination, the ALJ's interpretation of such testimony was unsupported.  At the hearing, the following exchange took place:

> Q.    What is the problem with your back?
> A.    The fourth and fifth lumbar disc [sic] are gone.
> Q.    Have you had back surgery?
> A.    No.
> Q.    Do you take medications for your back now?
> A.    Yes, I take Percocet . . . [t]o relieve the pain . . . [a]cross my lower back and down
>       my legs.

(*Id.* at 303.)  Contrary to the ALJ's interpretation of Plaintiff's testimony, I find that Plaintiff unequivocally testified that she did *not* have surgery.  In context, the only supportable interpretation of Plaintiff's statement that her fourth and fifth lumbar discs were "gone" is that those discs are damaged.  (*See id.*)

Moreover, contrary to the ALJ's determination that Plaintiff's "alleged back pain is not caused by a medically determinable impairment," the record reveals that Plaintiff has a long

history of treatment for her back pain. (*See id.* at 171–73 [receiving Percocet prescription medication for ruptured disc], 166 [complaining of back pain], 128 [taking Percocet prescription for "blown-out discs" suffered in 1989], 130 [reporting that back pain prevents her from walking], 217–18 [complaining of back pain, doctor continued Percocet prescription and recommended "walking program"]; *but see id.* at 294 [reporting that five mile walks taken three to four times each week "sometimes hurt[] her back"].) Plaintiff's regular complaints of back pain, coupled with Dr. Fairley's treatment of the pain with Percocet — an opiate susceptible to abuse — constitute substantial evidence that Plaintiff's back pain is not a *de minimis* condition that should be "weeded out" at an early stage of the administrative process because it cannot possibly meet the statutory definition of disability. *See Bowen*, 482 U.S. at 156. Accordingly, I find that remand is appropriate so that the ALJ may consider whether this "severe" impairment satisfies the further analytical steps established by the relevant regulations.

I pause briefly to discuss Plaintiff's submission of the April 25, 2005 radiology report. While this report most certainly postdates the ALJ's decision, that does not mean that it is *per se* irrelevant. Rather, this circuit has made clear that additional evidence is to be considered "only where it *relates to* the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(b) (2007) (emphasis added); *see Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (stating Appeals Council must consider evidence that is [1] new, [2] material, and [3] related to the period on or before the date of the ALJ's decision); *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991) (finding remand based on new evidence is only appropriate when "the proffered evidence relate[s] to the time period for which the benefits were denied"). While

this court finds Plaintiff's argument that "[t]here is no evidence in the x-ray of an acute injury . . ., which could lead one to hypothecate that [Plaintiff] had suffered some traumatic injury after [the ALJ's decision]" to be plausible, the argument nevertheless appears to be premised upon nothing more than untrained speculation.  (Pl.'s Suppl. at 6.)  The April 2005 radiology report simply does not address the cause or probable onset date of Plaintiff's back problems.  (*See id.*, Ex. A [Radiology Report].)

While these radiological findings are most certainly "new," I refrain from determining whether they are "material" or "related to the period on or before the date of the ALJ's decision." *See Chambers*, 389 F.3d at 1142.  Because I have already found that the record as it existed at the time the ALJ made his decision supported a step-two finding of a "severe" impairment, the question of the April 2005 radiology report's materiality and relatedness to the relevant time period is left to the Commissioner on remand.  *See id.* at 1143–44 (finding that a test conducted one day after the ALJ's decision related to the relevant time period, but test taken six months later did not).

c.      *The ALJ's Assessment of the Opinions of Drs. Ragsdale and Fairley*

(1)     *Dr. Ragsdale*

Plaintiff contends the ALJ erred in giving little weight to consultative examiner Dr. Ragsdale's opinions because: (1) they are consistent with Dr. Fairley's opinions; and (2) the ALJ "implies that Dr. Ragsdale was duped by [Plaintiff], who the ALJ apparently believes magnified her symptoms for the purpose of this evaluation."  (Pl.'s Br. at 13.)  I find no such errors.

Importantly, as a one-time examining physician, Dr. Ragsdale is a nontreating source.

"Nontreating source means a physician . . . who has examined [the claimant] but does not have, or

did not have, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502

(2007). "[F]indings of a nontreating physician based upon limited contact and examination are of

suspect reliability." *Frey*, 816 F.2d at 515; *see also Henderson v. Sullivan*, 930 F.2d 19, 21 (8th

Cir. 1991) (noting the court has "consistently discounted the opinions of non-treating physicians

who have seen the patient only once, at the request of the Social Security Administration"). In

assessing the weight an opinion deserves, an ALJ is required to consider a medical source's

opinion with regards to several factors, and to provide specific, legitimate reasons for rejecting it.

*Siegle v. Barnhart*, 377 F. Supp 2d 932, 940 (D. Colo. 2005) (citing *Doyal v. Barnhart*, 331 F.3d

758, 764 [10th Cir. 2003]) (other citations omitted). The requisite factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2)
> the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to which
> the physician's opinion is supported by relevant evidence; (4) consistency between
> the opinion and the record as a whole; (5) whether or not the physician is a
> specialist in the area upon which an opinion is rendered; and (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (citing 20

C.F.R.§ 404.1527[d][2]–[6]).

Here, the ALJ offered one chief reason for giving little weight to Dr. Ragsdale's opinion:

its inconsistency with the record as a whole. (Admin. R. at 34.) Specifically, the ALJ compared

Plaintiff's behavior during the consultative examination with Plaintiff's behavior during

contemporaneous visits to Dr. Fairley. (*Id.* at 34–35.) The ALJ wrote:

-33-

> On August 11, 2003, it was noted [Plaintiff] was stable and she was on a wait list for a "life coach." She was happy without any signs of mania. Her judgment was okay and her thinking clear. She did bring in a handwritten letter she claimed was from her dead mother.
>
> A week later, [Plaintiff's] condition appears to have seriously worsened for no reason other than it coincided with the consultative examination. This apparent worsening is given no weight, as it is inconsistent with the record as a whole. On August 19, 2003, [Plaintiff] saw Dr. Ragsdale . . . . At the consultative examination, it was noted that [she] was shaking, rocking in her chair, and had an extremely exaggerated startle response. She had poor eye contact. Her speech was severely interrupted by stuttering. She spoke to someone who was not there. She had difficulty providing history due to emotional lability. The undersigned notes that Dr. Ragsdale is the only physician who has witnessed [Plaintiff] apparently speaking to someone who is not there. All the other physicians rely on [Plaintiff's] self-reports. The undersigned does not find [Plaintiff's] talking to dead people credible.
>
> A week after the consultative examination by Dr. Ragsdale, [Plaintiff's] condition appears remarkable [sic] improved. On August 25, 2003, [Plaintiff] saw her treating physician and her affect was good and she appeared to enjoy and find relief in sharing her delusions/past experiences. Her judgment was poor, but thinking was clear.

(*Id.* at 34–35.) Although the ALJ's statements jumble somewhat the chronology of certain events summarized in Dr. Fairley's notes,[9] they accurately reflect the overall gist of the record. (*See id.* at 137, 126–32, 136.) During neither visit with Dr. Fairley was Plaintiff noted to have exhibited the rocking, exaggerated startle response, lack of eye contact, stuttering, or hallucinations that Plaintiff exhibited with Dr. Ragsdale. (*See id.* at 136–37.) Moreover, on the August 11 visit, Dr. Fairley noted that Plaintiff was "doing well [psychologically] on [her] current regimen," and was "happy, [with] signs of mania" while showing "okay" judgment and "clear[]" thinking. (*Id.* at

---

[9]The handwritten letter Plaintiff represented to be from her "dead mother" did not appear until Plaintiff's August 25, 2003 visit to Dr. Fairley. (Admin. R. at 136.)

136.)  The patient that appeared before Dr. Ragsdale could hardly be said to be "happy" or to be exhibiting clear thinking or acceptable judgment.  (*See id.* at 136–32.)  Thus, even considering Dr. Fairley's notation that Plaintiff exhibited unspecified "signs of mania," I find the ALJ's conclusion that Plaintiff's comportment during the consultative examination was a drastic departure from her contemporaneous behavior in the presence of Dr. Fairley is supported by substantial evidence.

Indeed, as the ALJ's review of the medical evidence suggests, Plaintiff's behavior in the Ragsdale examination also constitutes a sharp departure from her comportment in examinations with other caregivers.  When Plaintiff was seen by Ms. Wetton after the death of D.S.'s husband, Plaintiff did exhibit a flat affect and mercurial moods, but Plaintiff was fully oriented, spoke at a normal rate, and made appropriate eye contact — no rocking, stuttering, or hallucinations were noted.  (*Id.* at 206–07.)  When Plaintiff was seen at Southwest Colorado Mental Health Center on October 24, 2003, Plaintiff did exhibit anxiety and a flat, tearful affect, but was fully oriented, made appropriate eye contact, and spoke slowly — with no noted rocking or stuttering.  (*Id.* at 199–200.)  The healthcare provider noted skepticism with respect to Plaintiff's claims that she heard "voices from loved ones."  (*See id.* at 199.)  However, in an October 30, 2003 examination with Dr. Campbell — when Plaintiff was living in a homeless shelter — it was noted that Plaintiff was crying and stuttering.  (*Id.* at 192.)  Dr. Campbell prescribed Zyprexa "for the next two weeks to help with rapid thoughts and 'hallucinations.'"  (*Id.* at 193.)  While Dr. Campbell's observations comport somewhat with the symptoms observed by Dr. Ragsdale, no such symptoms were noted when Plaintiff next saw Dr. Fairley, who observed that Plaintiff was the "most lucid she [had] ever been."  (*Id.* at 216.)

Moreover, as the ALJ noted, on September 15, 2003 — less than a month after Dr. Ragsdale's examination — a state agency physician, Dr. Corsello, conducted an exhaustive review of Plaintiff's extensive medical history.[10]  (*Id.* at 174–91.)  Dr. Corsello concluded that although Plaintiff experienced anxiety and depression and exhibited sensitivity to stressful interpersonal relationships, she was noted by her treating physician to be stable on her current medications.  (*Id.* at 176.)  Dr. Corsello also observed that Plaintiff talked "about 'channeling' [and] communicating [with] the dead — but was never noted to be [psychotic] except at [psychological] c[onsultative] e[xamination] (where she appeared to be exaggerating her [symptoms])."  (*Id.*)  Elsewhere, Dr. Corsello determined that during the consultative examination with Dr. Ragsdale, Plaintiff's "presentation, report of [symptoms,] [and] performance" were so inconsistent with notes from Dr. Fairley and various emergency room doctors "as to <u>not</u> [sic] be credible."  (*Id.* at 191 [emphasis in original].)

While Plaintiff attempts to portray the ALJ's decision to discount Dr. Ragsdale's opinion as a substitution of the ALJ's lay opinion for Dr. Ragsdale's informed medical opinions, Plaintiff *never* mentions Dr. Corsello's evaluation at any point in her briefs.  (*See* Pl.'s Br.; Pl.'s Resp.)  I find that the ALJ did not overstep by noting the inconsistencies between Plaintiff's behavior before treating physicians and her behavior before a physician acting at the behest of the Social

---

[10]It should be noted that Dr. Ragsdale did not purport to review Plaintiff's medical history. (*See* Admin. R. at 126–32.)

Security Administration.[11]  *See* 20 C.F.R. § 404.1527(d)(4) (2007) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  Moreover, the ALJ's express reliance on Dr. Corsello's "well-supported" opinion regarding the inconsistency of Dr. Ragsdale's opinions with the record as a whole confirms that the ALJ did not, as Plaintiff contends, "strain to interpret the medical evidence to discredit" Dr. Ragsdale's conclusions.  (Admin. R. at 37; Pl.'s Br. at 13.)  I recognize that the record exhibits certain ambiguities and inconsistencies; however, I find that substantial evidence supported the ALJ's determination that, on balance, Dr. Ragsdale's opinions are inconsistent with the record as a whole.

### (2)    *Dr. Fairley*

Plaintiff next argues that the ALJ thrice erred in rejecting Dr. Fairley's medical opinions.  (*Id.* at 9–12.)  Specifically, Plaintiff contends the ALJ erred by: (1) misinterpreting Dr. Fairley's treatment notes; (2) discounting Dr. Fairley's opinions because she is not a mental health specialist; and (3) "rejecting" Dr. Fairley's opinion because "she added the diagnosis of post-menopausal."  (*Id.*)

An ALJ must follow a sequential analysis when evaluating the opinion of a treating physician.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  In the first step of this analysis, he must consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  *Id.* (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *2).

---

[11]It does not escape the court that *this* inconsistency is consistent with the ALJ's determination that Plaintiff's performance at the Social Security Hearing was not credible.

"If the answer to this question is 'no,' then the inquiry at this stage is complete," and he need not give the opinion controlling weight. *Id.* If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. *Id.* In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight. *Id.*

If he determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must next consider whether the opinion should be rejected altogether, or assigned some lesser weight. *Id.* He does this by applying the factors provided in 20 C.F.R. § 404.1527, recited above. *Watkins*, 350 F.3d at 1300. If, after considering these factors, the ALJ assigns less than controlling weight to the opinion, he must give good reasons for the lesser weight he assigns. *Id.* If he rejects it altogether, he must give "specific, legitimate reasons" for doing so. *Id.* (quotation omitted).

As noted above, Dr. Fairley testified that Plaintiff had the following functional limitations: (1) extreme difficulties in maintaining social functioning; (2) frequent deficiencies in maintaining concentration, persistence, and pace; and (3) repeated episodes of decompensation. (Admin. R. at 327.) Dr. Fairley concluded that: (1) Plaintiff would not be able to handle working under a supervisor; (2) her agoraphobia would make it difficult to get to any job; and (3) Plaintiff could not work from home "because a schedule would be perceived as a threat." (*Id.*) The ALJ offered three specific reasons for discounting these opinions:

> First, [Dr. Fairley] is a family practitioner and not a mental health specialist.
> Second, her office notes do not support the marked and extreme limits she indicate
> [Plaintiff] has as a result of the mental impairments. Third, Dr. Fairley added the

> diagnosis of postmenopausal, which neither she, nor any other physician, has ever
> diagnosed in [Plaintiff].

(*Id.* at 37.)  Plaintiff objects to each of these three reasons for rejecting Dr. Fairley's testimony.

(Pl.'s Br. at 9–12.)  I consider each objection in turn.

First, Plaintiff appears to argue that Dr. Fairley's notes are consistent with the limitations

the doctor espoused at the hearing.  (*Id.* at 9–10.)  Plaintiff states:

> While Dr. Fairley's notes indicated at times that [Plaintiff] had "stabilized" and was
> "doing better," these are purely subjective measures which are not susceptible to
> being quantified.  For example, simply because someone has "stabilized" does not
> mean, as the ALJ assumes, that they [sic] have a full range of functioning.

(*Id.* at 9.)  Plaintiff's argument misrepresents the ALJ's findings and attempts to sweep a range of

inconsistent evidence under a rug woven of purportedly "subjective" measures.  The ALJ did not

"assume" that Plaintiff had a "full range" of mental functioning.  Instead, he determined that

because of her mental impairments, Plaintiff could not: (1) interact with the general public; (2)

regularly interact with co-workers; (3) perform complex tasks; or (4) handle more than minimal

supervision.  (Admin. R. at 38.)  Moreover, the ALJ's decision does not, as Plaintiff's argument

suggests, put much weight on the "subjective measures" to which Plaintiff points.  Instead, the

chief conclusion to be drawn from the ALJ's thorough review of the body of evidence is that Dr.

Fairley's testimony was inconsistent with the daily activities Plaintiff reported to Dr. Fairley

during her bi-weekly appointments.  (*See id.* at 34–38.)  One would not expect the notes of a

doctor who testified that her patient suffers disabling agoraphobia to reflect that the patient (1)

walked to adult education classes two to four times a week, (2) took five mile walks three to four

times a week, (3) invited a shifting cast of missionaries into her home, (4) "home schooled" her

teenage granddaughter, (5) attended tri-weekly Bible study classes, or (6) engaged in a sexual

relationship, but, nevertheless, Dr. Fairley's notes indicate that Plaintiff engaged in each of those

activities.  (*Id.* at 310–11, 294, 306, 316, 269, 162, 277.)  Nor would one expect the notes of a

doctor who testified that her patient suffers "frequent deficiencies in maintaining concentration,

persistence and pace" to reflect that the patient (1) had written multiple books of poetry, (2)

studied spelling and grammar two to four times each week, (3) baked breads and pies, or (4)

passed her time reading the Bible, but, again, Dr. Fairley's notes indicate as much.  (*Id.* at

289–91, 310–11, 219.)  Additionally, one would expect that the notes of a doctor who testified

that her patient suffers "frequent episodes of decompensation" would reflect that the patient,

indeed, frequently suffered episodes of decompensation, but Dr. Fairley's notes do not.  (*See id.*

at 133–73, 214–22, 267–96.)  Thus, the ALJ's finding that Dr. Fairley's treatment notes were

inconsistent with her testimony is supported by substantial evidence.

In connection with her misguided argument that the ALJ somehow misinterpreted Dr.

Fairley's notes, Plaintiff also complains that by precluding Dr. Fairley from testifying about

anything in her notes, the ALJ "effectively robb[ed] her of the ability to quantify what she meant

in any given treatment note."  (Pl.'s Br. at 11.)  The court perceives little, if any, need for such

"quantification."  This court recognizes that what mattered most for the purpose of the ALJ's

analysis was not what Dr. Fairley meant when she stated that Plaintiff had "stabilized" or was

"doing better," but rather the disjunction between the doctor's more concrete findings and

notations concerning Plaintiff's symptoms and daily activities, on the one hand, and Dr. Fairley's

testimonial assessment of Plaintiff's level of disability at the hearing, on the other.

The ALJ also discounted Dr. Fairley's testimonial assessments based upon the fact that the doctor is a family practitioner, rather than a mental health specialist. (Admin. R. at 37.) This decision comports with the relevant regulations. *See* 20 C.F.R. § 404.1527(d)(5) (2007) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). While it is true, as Plaintiff points out, that Dr. Fairley testified that she has had "[one-hundred] hours of continuing medical education in credit in psychopharmacology and [she] do[es] a lot of psychiatry as a family doctor," this does not change the fact that it was appropriate for the ALJ to consider that Dr. Fairley is not a mental health specialist. (Admin. R. at 322.) Had Dr. Fairley's lack of specialization been the only factor upon which the ALJ had relied, I would be inclined to remand the issue. *See Watkins*, 350 F.3d at 1300; 20 C.F.R. § 404.1527(d)(5) (2007). But specialization was most certainly not the only factor the ALJ considered. To employ a tired but apt metaphor, Dr. Fairley's lack of specialization was icing on the cake of her testimony's inconsistency with the factual and medical record before the ALJ.

Plaintiff takes an alternative approach, arguing that "to the extent Dr. Fairley is not a 'mental health expert' that rationale for discrediting her is eviscerated when it is considered that she relied on Dr. Ragsdale's opinions regarding diagnoses and treatment." (Pl.'s Br. at 11.) Once again, I must disagree. The fact that Dr. Fairley relied on an a medical opinion the ALJ properly discounted as inconsistent with the record gets Plaintiff nowhere. (*See Analysis* § 3(c)(1), *supra*.)

Finally, Plaintiff objects to what she construes as "the ALJ's rejection of Dr. Fairley's opinion because she added the diagnosis of post-menopausal." (Pl.'s Br. at 11–12.) At the

hearing, Dr. Fairley merely testified that Plaintiff was post-menopausal and that menopause can exacerbate the symptoms of post-traumatic stress disorder.  (Admin. R. at 322.)  Apparently, the ALJ was stricken by this testimony because it was the first time he had seen any evidence suggesting Plaintiff was postmenopausal and, thus, perceived this medical testimony to be inconsistent with the record.  (*Id.* at 37.)  Medical evidence that Plaintiff subsequently submitted to the Appeals Counsel indicated that Plaintiff had been menopausal during the relevant time period.  (*See id.* at 274); *see also Chambers*, 389 F.3d at 1142 (stating Appeals Counsel must consider evidence that is [1] new, [2] material, and [3] related to the period on or before the date of the ALJ's decision).  Even assuming that this evidence is material, it is insufficient to undermine the substantial evidence supporting the ALJ's finding that the functional limitations espoused by Dr. Fairley were inconsistent with not only many of her own notes, but also the record as a whole.  Consequently, I reject Plaintiff's assignments of error on this front.

       **d.**       ***The ALJ's Treatment of the VE's Testimony***

       First, Plaintiff asserts that the ALJ's conclusion that Plaintiff's RFC would not preclude her from her past relevant work as a laundry worker is not supported by substantial evidence. (Pl.'s Br. at 17–18.)  More specifically, Plaintiff asserts that the ALJ's determination that she retained the capacity to work as a laundry worker was not supported by substantial evidence because the DOT does not indicate: (1) how frequently a laundry worker interacts with the public; or (2) the level of supervision required for the job.  (*Id.* at 17.)  Second, Plaintiff argues that the ALJ's decision to disregard the VE's testimony because such testimony was inconsistent with the

Dictionary of Occupational Titles ("DOT") constitutes a failure to develop the record.  (*Id.* at 16–17.)  I need only consider Plaintiff's first argument.

The ALJ articulated Plaintiff's RFC as such: "cannot deal with the general public[,] can occasionally deal with co-workers, cannot perform complex tasks . . ., and can deal with [only] minimal supervision."  (Admin. R. at 38.)  The "Job Description Report" in the DOT for a "Laundry Worker" position does not state that a laundry worker labors alone or apart from others or has only minimal supervision.  (*See id.* at 95.)  However, after stating that he had reviewed the DOT and the VE's testimony, the ALJ concluded that the VE's testimony that Plaintiff could not return to any of her past work was inconsistent with the DOT.  (*See id.* at 38.)  Nothing in the ALJ's decision, the DOT job description, or the VE's testimony sheds any light on the nature of this "inconsistency."  Were the inconsistency glaring, perhaps the ALJ would not have needed to articulate it.  However, in light of the opacity of the very DOT evidence upon which the ALJ purported to rely, I cannot say that the ALJ's determination that Plaintiff could perform her past relevant work was based on substantial evidence.  On remand, the ALJ should elaborate upon the basis of his determination, elicit further VE testimony, or reevaluate his determination.

**4.**      ***Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is

AFFIRMED in part and REVERSED in part.  The case is hereby REMANDED for proceedings

consistent with this opinion.

Dated this 1ˢᵗ  day of June, 2007.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge